HOTCHKISS (PARKER v.). See Case No. 10,739.

---

## Case No. 6,719.

HOTCHKISS v. TRADESMEN'S NAT. BANK et al.

[10 Blatchf. 384.] [1]

Circuit Court, S. D. New York. Jan 22, 1873. [2]

BONDS—BONA FIDE HOLDER FOR VALUE WITHOUT NOTICE—NEGOTIABLE PAPER.

1. The mortgage bond of a railroad corporation, bearing a number, and payable to bearer, with coupons attached, payable to bearer, contained, on its face, a statement, that the corporation agreed "to make the scrip preferred stock attached to this bond full paid stock," at specified times, upon surrender to the corporation, of the bond and the unmatured coupons, and that it was issued in conformity with the articles of association of the corporation. H., the owner and possessor of such bond, was also the possessor of a certificate for ten shares of the scrip preferred stock of the corporation, certifying that he was entitled to such shares, and declaring, that, on the surrender of such certificate, and of such mortgage bond, designated by its number, and of all unmatured coupons thereon, at specified times, he would be entitled to ten shares of full paid preferred stock. The bond and the certificate of stock, attached together by a pin, were stolen from H. The bond, unaccompanied by the certificate, went into the hands of T., who, in good faith, and without any other notice than was imported by the bond, advanced money on the bond: Held, that T. had notice of whatever was contained in the articles of association, in respect to the bond.

2. Neither the articles, nor the bond, nor the certificate, required the bond to be registered, or to be transferable solely on the books of the corporation, or that the debt evidenced by the bond and the coupons should be transferable otherwise than by delivery.

3. H. could part with the bond by delivery, without transferring the scrip stock.

[See note at end of case.]

4. The promise, in the bond, to pay money, was a separate obligation from the agreement in regard to converting the scrip stock into full paid stock.

[Cited in De Voss v. City of Richmond, 18 Grat. 338.]

[See note at end of case.]

5. T. was entitled, as against H., to retain the bond, as having taken, before maturity, for a

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Affirmed in 21 Wall. (88 U. S.) 354.]

valuable consideration, in the usual course of business, without notice of any defect of title, a coupon bond, payable to bearer.

[See note at end of case.]

[This was a bill in equity by Charles B. Hotchkiss, against the Tradesmen's National Bank, the National Shoe and Leather Bank of the City of New York, and the Milwaukee and St. Paul Railway Company.]

Francis N. Bangs, for plaintiff.

Henry N. Beach, for Shoe and Leather Bank.

Smith & Woodward, for Tradesmen's Bank.

BLATCHFORD, District Judge. On the 30th of November, 1868, the plaintiff, at Bridgeport, Connecticut, was the owner and in possession of three bonds, for $1,000 each, issued by the Milwaukee and St. Paul Railway Company, and numbered respectively 1,947, 2,070 and 2,425. There were then annexed to each of the bonds 48 coupons or interest warrants, each for $35, and payable each successive six months from and including the 1st day of January, 1869, to and including the 1st day of July, 1892. The bond and its coupons were all of them printed on the face of one and the same sheet of paper, and none of such 48 coupons had then been cut off. Bond No. 1,947 read thus: "Know all men by these presents, that the Milwaukee and St. Paul Railway Company are indebted to Isaac Seymour, Horace Galpen, William Gould, Fred. P. James, D. M. Hughes, George Smith and Francis Vose, citizens of the state of New York, or bearer, in the sum of one thousand dollars, for the purchase money of their entire corporate property, which sum said company promise to pay to the bearer hereof on the first day of January, A. D. 1893, at the office or agency of the company in the city of New York, with interest thereon from the first day of July, A. D. 1863, at the rate of seven per centum per annum, payable semi-annually, at its office or agency in the city of New York, on the first day of January and July in each year, on the presentation and surrender of the annexed coupons, as they severally become due, and, in case of non-payment of interest for six months, then, without demand or notice, the principal of this bond shall become due and payable. The said company also agree to make the scrip preferred stock attached to this bond full paid stock at any time within ten days after any dividend shall have been declared and become payable on said preferred stock, upon surrender to the company, in the city of New York, of this bond and the unmatured interest warrants. This bond is one of a series of bonds, amounting to $2,200,-000, and, if the company acquire the road known as the Eastern Division of the La Crosse and Milwaukee Railroad, then this issue of bonds may be increased $2,000,000,

and, if the company acquire the Milwaukee and Western Railroad, and extend it from Columbus to Portage, then this issue may be increased $2,000,000, and, if the company acquire the Milwaukee and Horicon Railroad, this issue of bonds may be increased $400,000. All of which bonds are executed and delivered in conformity with the laws of Wisconsin, the articles of association of the company, the vote of the stockholders, and resolution of the board of directors. And the bearer hereof is entitled to the security derived from a mortgage or deed of trust duly executed and delivered by said company to Isaac Seymour and N. A. Cowdrey, trustees, conveying the entire property of this company, real and personal, and all its rights, franchises and annuities, dated May 6th, A. D. 1863, and, also, to the benefits to be derived from a sinking fund established by and in said mortgage or deed of trust, of all such sums of money as are received from the sales of lands donated or granted to this company by the United States or by the state of Wisconsin. This bond shall not be valid until it shall have been authenticated by a certificate endorsed hereon, and duly signed by both of said trustees, or their or his successor or successors, and is issued, received and held subject to the terms and conditions contained in said mortgage. In witness whereof, the said company have caused their corporate seal to be hereto affixed, and their president and secretary to sign the same, this sixth day of May, A. D. 1863." On the face of the bond were the number of the bond, in two places, and, also, the words: "Sixty coupons attached. Last six months interest, $35, payable with bond." Each coupon was in this form: "The Milwaukee and St. Paul Railway Company promise to pay to the bearer, thirty-five dollars, on the first day of ——, 18—, in the city of New York, for interest due on bond No. 1,947. Coupon No. ——. H. E. Glasford, Agent." The blanks in the coupons were properly filled.

The face of the bond being uppermost, if the bond was folded over from right to left, by a fold in the middle of its width, and running from top to bottom, so as to bring one-half of the back of the bond uppermost, that half was found to be divided, by two up and down lines, into three columns, each with a printed heading, the first column being headed, "Date of Transfer," with the figures "186–" a short distance below, to the left, the second column being headed, "To Whom Transferred," and the third column being headed, "Attest by Transfer Agent;" and, in each column, were fourteen horizontal lines. There were no entries in any of these columns when the bond left the possession of the plaintiff, as hereafter mentioned.

On the other half of the back of the bond were these words: "$1,000 Bond, No. 1,947. First Mortgage, Milwaukee & St. Paul Railway Company. 7 per cent. Convertible. In-

terest, January & July. Due, 1893. This is to certify that this bond is included in a first mortgage of the entire corporate property, real and personal, rights, franchises, and immunities, of the Milwaukee and St. Paul Railway Company, in trust to the undersigned, to secure the payment of $2,200,000; and, if the company acquire the road known as the Eastern Division of the La Crosse and Milwaukee Railroad, then it may be to secure the payment of $2,000,000 additional, and, if the company acquire the road known as the Milwaukee and Western Railroad, then it may be to secure the payment of $2,000,000 additional, and, if the company acquire the road known as the Milwaukee and Horicon Railroad, then it may be to secure the payment of $400,000 additional. I. Seymour, N. A. Cowdrey, Trustees."

Bonds Nos. 2,070 and 2,425, when they left the possession of the plaintiff, as hereafter mentioned, read in the same way, and were, in all respects, in the same condition, as to themselves, and the contents of their backs, and their coupons, with the proper changes of numbers, as bond No. 1,947, except that bond No. 2,425 contained the words "indebted to Isaac Seymour and N. A. Cowdrey," instead of the words "indebted to Isaac Seymour, Horace Galpen, William Gould, Fred. P. James, D. M. Hughes, George Smith, and Francis Vose."

The "articles of association of the company," referred to in the bonds, declare, in their third article, that the capital stock shall be divided into "preferred stock" and "common stock," and that a part of the "preferred stock" shall be known as "scrip preferred stock." On the scrip preferred stock one dollar per share is declared and acknowledged to have been paid. On the rest of the preferred stock, and on the common stock, one hundred dollars per share are declared and acknowledged to have been paid. The preferred stock is fixed at not exceeding $3,450,000, or 34,500 shares. The articles say: "Of the said $3,450,000 preferred stock, an amount not exceeding $2,200,000 at par, or 22,000 shares, shall be set apart and designated as 'scrip preferred stock.' The scrip preferred stock here named, or hereafter named, shall not at any time exceed the amount of outstanding mortgage bonds hereinafter named. The scrip preferred stock shall not be subject to any assessment, and shall entitle the person in whose name it stands upon our books to all the rights and privileges of other stockholders, except that it shall not entitle the holder to any dividend, or other profit or increase, from the income or assets of this company. It shall be issued in certificates of five and ten shares each, and shall accompany each mortgage bond of the company. The holder thereof shall have the right, at any time within ten days after any dividend shall have been declared and become payable on the preferred stock, to make the scrip preferred stock attached to this bond full paid stock, upon the surrender to the company of the mortgage bond named by its number in his scrip certificate, and, upon surrendering said scrip certificate and bond, he shall be entitled to receive therefor the same number of shares of preferred full paid stock, and entitled to dividends. The said preferred stock, except said scrip stock, shall be entitled to a dividend of seven per centum per annum, from the net earnings of each current year, after payment of interest on all the mortgage bonds, if the company earn so much during the current year, and before the payment of dividends to any other class of stockholders; but the company may reserve a reasonable working capital or surplus before the dividend shall be declared or paid on said preferred stock, which surplus shall not exceed at any time the aggregate sum of $250,000, over and above the floating or unfunded debt, and the accrued interest on the mortgage bonds. If the net earnings of the company are not as much as seven per cent. in any one year, then the said preferred stock shall receive, for that year, a dividend of whatever the said net earnings are, after the payment of interest on the mortgage bonds, and the reasonable reserve for a working capital, as above described. Said preferred stock shall not have any claim upon the earnings of any other year, for the non-payment of dividends of any preceding year. And, whenever the company earns sufficient, over and above the payment of interest on the bonds, and the reserve above named, to pay a greater sum than seven per cent. on outstanding preferred stock, and seven per cent. on the common stock, then the said preferred stock shall share pro rata with the common stock, in such earnings." The sixth article provides as follows: "The corporation shall have power to issue bonds in sums of $500 and $1,000, to an amount not exceeding two millions two hundred thousand dollars. * * * All of said bonds shall bear an interest not exceeding seven per centum per annum, the principal and interest payable in the city of New York, the interest semi-annually, the principal within thirty years from date. They shall also contain a provision, that, if the company make default in the payment of interest, or in the application of the sinking fund, as hereinafter provided, for six months, the principal shall thereupon become due without demand or notice. The said corporation shall have power to secure the payment of all the bonds above authorized to be issued, by a mortgage or trust deed upon this franchise, and all the real and personal property of the company, now owned or hereafter to be acquired by them, and to embrace the entire corporate property, and all its franchises and privileges. The mortgage shall also contain a provision for a sinking fund for the payment of said mortgage bonds, by which the new

company shall obligate themselves to pay to the trustees of said mortgage bonds, all such sums of money, less the expenses of sales, as shall be derived from the sale of any lands which may have been, or shall hereafter be, donated or granted by either the United States or the state of Wisconsin, to aid in building this road, or that shall in any manner be acquired by this company. And said lands shall be fairly and equitably valued and classified by the company, or by such persons as they together shall appoint; and, upon sale of said lands, said mortgage bonds may be received at par and accrued interest, in payment therefor, and the bonds thus received in payment shall be immediately cancelled. The company shall keep a proper registry or account of all the bonds thus paid by them, and the number or amount of bonds thus cancelled shall be reported by said company to the stockholders at each annual meeting, and said bonds shall be presented and shown at said meeting. And said trust deed shall contain all other reasonable and proper provisions for making said lands the most productive and available to the company, as a sinking fund for the payment of said bonds. The bonds secured by said mortgage shall be convertible, at the option of the holder, into the preferred stock, at any time within ten days after any dividend shall have been declared and become payable on said preferred stock. The said mortgage deed and bonds shall be signed by the president or vice-president and secretary, and the seal of the company shall be affixed thereto. * * * The said mortgage or trust deed may also contain covenants and agreements authorizing the bondholders to vote in all stockholders' meetings, as follows—each one hundred dollars of the principal of the outstanding bonds shall be entitled to one vote—and giving the bondholders the same pro rata voice in the management of the company with, and as if they were, stockholders to the amount of their bonds." The seventh article provides as follows: "The preferred stockholders shall elect the directors until a dividend shall have been earned, declared, and paid on the common stock, and, until then, the common stockholders shall have no vote or voice in the election of directors." The tenth article provides as follows: "Upon the dissolution of this corporation, after the payment of its debts, the remaining assets shall be divided among the different classes of stockholders according to their preferences, that is to say, the preferred stock, except the scrip stock, shall be first paid in full, and the balance divided among the common stockholders, pro rata."

Up to the time the said three bonds left the possession of the plaintiff, he owned and had in his possession three certificates issued by said company to him, each for ten shares of the scrip preferred stock before mentioned, which certificates were numbered, severally, 7667, 7668 and 7669, and were all of them issued September 17th, 1864. Certificate No. 7668 read as follows, on its face: "Certificate for Scrip Preferred Stock, Issued Septr. 17th, 1864. No. 7668, Ten Shares. This is to certify, that Charles B. Hotchkiss, of New Haven, Conn., is entitled to ten shares of the capital stock of the Milwaukee and St. Paul Railway Company, designated as 'scrip preferred stock' in the articles of association of the company. This stock is not entitled to any dividend. It has one dollar per share paid thereon, and is not liable or subject to any assessment. Upon the surrender of this certificate, and mortgage bond No. 1947 of the company, and all unmatured coupons thereon, at any time within ten days after any dividend shall have been declared and become payable on the full stock of the preferred stock of the company, the said Hotchkiss is entitled to receive ten shares of said full paid preferred stock. This stock is transferable only on the books of the company, at their office in the city of New York, in person, or by attorney, on the surrender of this certificate. This certificate and the stock represented hereby is issued and received subject to all the terms, conditions and limitations of this company, and is not valid until countersigned by the transfer agent of the company, and by the registrar of transfers. In witness whereof, the company have caused this certificate to be signed by the president." The certificate was signed, on its face, by the president and the transfer agent, and countersigned by the registrar of transfers, and had printed on its back a blank power of attorney, in this form, the blanks not being filled: "Know all men by these presents that —— for value received, have bargained, sold, assigned and transferred and by these presents do bargain, sell, assign and transfer unto —— shares of the scrip stock of the Milwaukee and St. Paul Railway Company, standing in —— name on the books of the said company, and hereby constitute and appoint —— true and lawful attorney, irrevocably, for —— and in —— name and stead, but to —— use, to sell, assign, transfer and set over, all or any part of the said scrip stock, and, for that purpose, to make and execute all necessary acts of assignment and transfer, hereby ratifying and confirming all that —— said attorney shall lawfully do by virtue hereof. In witness whereof, —— have hereunto set —— hand this —— day of —— one thousand eight hundred and sixty ——. Sealed and delivered in presence of ——." Certificate No. 7667 was, in all respects, like certificate No. 7668, except that it contained the figures "7667," instead of "7668," and "2070," instead of "1947." Certificate No. 7669 was, in all respects, like certificate No. 7668, except that it contained the figures "7669," instead of "7668," and "2425," instead of "1947." The three bonds, and the three certificates, when

they left the possession of the plaintiff, were not, any one of them, attached to any other one or more of the rest of them, in any other manner than by pins.

The company, on the 2d of November, 1863, issued to Russell Sage bond No. 1947, and, at the same time, issued to him certificate No. 1947, for ten shares of scrip preferred stock, which certificate was like, in form, to certificate No. 7668, except that it contained the words, "Novr. 2d, 1863," instead of "Septr. 17th, 1864," and the figures "1947," instead of "7668." Sage, by a written transfer on the books of the company, dated December 23d, 1863, transferred to F. P. James & Co., "subject to all the terms, conditions and limitations of the articles of association of the company," ten shares of scrip preferred stock, (but not bond No. 1947,) and surrendered to the company the said certificate No. 1947, and it issued to F. P. James & Co. certificate No. 7086, which certificate was like, in form, to certificate No. 7668, except that it contained the words, "Decr. 23d, 1863," instead of "Sept. 17th, 1864," and the figures "7086," instead of "7668." The company, on the 2d of January, 1864, issued to F. P. James & Co. bond No. 2070, and, at the same time, issued to them certificate No. 2070, for ten shares of scrip preferred stock, which certificate was like, in form, to certificate No. 7668, except that it contained the words, "Jan. 2d, 1864," instead of "Septr. 17th, 1864," and the figures "2070," instead of "7668," as the number of the certificate, and the figures "2070," instead of "1947," as the number of the bond. F. P. James & Co., by a written transfer on the books of the company, dated September 17th, 1864, transferred to the plaintiff, "subject to all the terms, conditions and limitations of the articles of association of the company," twenty shares of scrip preferred stock, and, also, bonds Nos. 1947 and 2070, and surrendered to the company the said certificates Nos. 2070 and 7086, and it issued to the plaintiff the said certificates Nos. 7667 and 7668. The company, on the 7th of July, 1863, issued to Alfred Noxon bond No. 2425, and, at the same time, issued to him certificate No. 2425, for ten shares of scrip preferred stock, which certificate was like, in form, to certificate No. 7668, except that it contained the words, "July 7th, 1863," instead of "Septr. 17th, 1864," and the figures "2425," instead of "7668," as the number of the certificate, and the figures "2425," instead of "1947," as the number of the bond. Noxon, by a written transfer on the books of the company, dated September 17th, 1864, transferred to the plaintiff, "subject to all the terms, conditions and limitations of the articles of association of the company," ten shares of scrip preferred stock, and, also, bond No. 2425, and surrendered to the company the said certificate No. 2425, and it issued to the plaintiff the said certificate No. 7669. The plaintiff never transferred, on the books of the company, any of the shares of

scrip stock represented by certificates Nos. 7667, 7668 and 7669, and those certificates are now outstanding and have not been surrendered to the company. The plaintiff never signed any of the transfers on the backs of said certificates. The three bonds and the three certificates issued to the plaintiff were stolen from his possession, by robbery, on the 30th of November, 1868.

On the 20th of February, 1869, the National Shoe and Leather Bank, one of the defendants, received from a firm called Waterhouse, Midgley & Co., the said bond No. 1947, and loaned to that firm, on its note, with the said bond as collateral security, the sum of $800, the bonds being then quoted in the market as worth 92 per cent. Such note was renewed several times, and the bank now holds, in renewal, a note of said firm, dated October 5th, 1869, at two months, for $800, with the said bond No. 1947 as collateral security, which bond now has on it three less coupons than it had when it left the possession of the plaintiff, the coupons due January 1st, 1869, July 1st, 1869, and January 1st, 1870, being now gone, and there being now on it 45 coupons, beginning with the one due July 1st, 1870, which is No. 16. But, coupon No. 15, due January 1st, 1870, is in the possession of the bank, cut off from the bond. When the bank received the bond, it had on it only 47 coupons, beginning with the one due July 1st, 1869, No. 14, which one it afterwards allowed the said firm to have.

On the 22d of January, 1869, the Tradesmen's National Bank, one of the defendants, received from one B. Starr Midgley one of the said two bonds, Nos. 2070 and 2425, and loaned to him on his note, with the said bond as collateral security, the sum of $800. On the 29th January, 1869, the last-named bank received from Midgley the other one of the said two bonds, Nos. 2070 and 2425, and loaned to him $800 more, giving up to him his note for $800, and taking from him his note for $1,600, and thereafter holding the two bonds as collateral security for the last-named note. Such note was renewed several times, and the bank loaned to Midgley $150 more on the bonds, and now holds a note of his, dated February 4th, 1870, on demand, for $1,791 75, with interest, with the said two bonds, Nos. 2070 and 2425, as collateral security, each of which two bonds has now on it two less coupons than it had when it left the possession of the plaintiff, the coupons due January 1st, 1869, and July 1st, 1869, being now gone, and there being now on each of said bonds 46 coupons, beginning with the one due January 1st, 1870, which is No. 15. But, coupon No. 14, due July 1st, 1869, from each of the two bonds, is in the possession of the bank, such coupons having been cut off by it, and presented for payment to the company, which was refused. When the bank received the two bonds, each had on it only 47 coupons, beginning with No. 14. When the bonds were received by

the banks respectively, no certificates of scrip preferred stock, or other papers, accompanied them.

The bill in this case, which was filed in April, 1870, claims that the bond and the certificate of scrip stock constituted but one instrument; that the several parts thereof are not capable of separation and division, in such way that the title to one part thereof can be transferred to one person, and the title to some other part thereof to another person; that the owner or holder of the certificate cannot get the benefit thereof without possession of the remaining part of the obligation; that the holder of the remaining part of the obligation cannot get, and is not entitled to, a performance of the same, as against the company, without possession of the certificate; and that, on the face of the obligation, reference is expressly made, in the several parts thereof, to other parts of the same obligation, so that the holder of one portion thereof is chargeable with notice of the rights of the holder of the other portion thereof. The bill prays for a decree, declaring that the plaintiff is, as against the banks, the true and lawful owner of the said contracts and obligations, and of every part thereof, and directing that the banks respectively deliver up to him such parts of the said obligations as they have, and respectively account to him for all moneys which they have collected thereon, and that the company be enjoined from making any payment, on account of said obligations, to any other person than the plaintiff, and that it issue to the plaintiff new certificates in the place of those so stolen from him, and admit him to all the rights contracted for by it in the said obligations, notwithstanding any claim on the part of the banks. The bill was taken pro confesso as against the company, it having voluntarily appeared in the suit.

It is contended, for the plaintiff, that it is apparent, by the bonds, that it was not intended that possession alone of them should be proof of ownership; that they are not, by their terms, performable in favor of the holders of them, that they are not transferable by delivery; that there is, in respect to each bond, a single contract, evidenced by the bond and by the scrip certificate, the two being a unit; that there is not an agreement to pay money to one person, and an agreement to permit another person to take preferred stock by conversion; that no person can hold any part of the contract, as against the company, who is not, at the same time, a transferee of the scrip stock as well as a holder of the bond; that, as the scrip stock, and its certificate, could not be transferred merely by delivery, the bond could not be transferred separately by delivery; and that the banks, by what appears on the bonds, and by the articles of association, to which the bonds refer, must be held to have had notice that no person could own the bond who did not produce a certificate for scrip preferred stock, as the badge of his ownership, not only of the stock, but of the bond.

For the banks, it is contended, that the bond and the certificate of scrip stock do not constitute only a single instrument; that, by the articles of association, the bond is made one contract, and the certificate is made another contract; that the bond is transferable by delivery, while the stock is transferable only on the books of the company; that the plaintiff, if he had retained the bond, and were to keep it till it matured, could collect all the coupons and also the principal, without producing or surrendering any certificate of stock; that the ownership of the stock, and the possession of the certificate thereof, is only necessary to the exercise of the privilege of conversion; and that the banks are entitled to be recognized as the parties to whom the principal and interest of the bonds are payable, although they claim no privilege of converting the bonds into preferred stock.

The statement, on the face of the bond, that it is executed and delivered in conformity with the articles of association of the company, is notice to the party taking the bond, of whatever those articles contain, in respect to the bond. By the sixth article, the bond is to be convertible, at the option of its holder, into preferred stock, at any time within ten days after any dividend shall have been declared and become payable on the preferred stock. The endorsement on the bond speaks of the bond as a convertible bond. The face of the bond makes the bond convertible, only by the declaration, that the company agrees to make the scrip preferred stock attached to the bond full paid stock at any time within ten days after any dividend shall have been declared and become payable on the preferred stock, on the surrender to the company of the bond and the undue coupons. In the articles of association, the third article provides, that the scrip preferred stock shall be issued in certificates of five and ten shares each, (each share being $100, if full paid,) and shall accompany each mortgage bond, (the bonds being $500 and $1,000 each,) and that the holder of the bond shall have the right, at any time within ten days after any dividend shall have been declared and become payable on the preferred stock, to make the scrip preferred stock attached to the bond full paid stock, on the surrender to the company of the bond named by its number in his scrip certificate, and that, on surrendering such scrip certificate and bond, he shall be entitled to receive therefor the same number of shares of full paid preferred stock. The bond says nothing about converting the bond, other than what is to be implied from what it does say, and from the endorsement, nor does it say anything about surrendering the scrip stock or the certificate. The bond, in speaking of the scrip preferred stock attached to it, refers, necessarily, to the cer-

tificate of scrip preferred stock mentioned in the articles of association. That certificate provides that, on the surrender of itself, and of the bond designated by number in it, and of the undue coupons on such bond, the person to whom the certificate is issued shall be entitled to the like number of shares of full paid preferred stock, and that the scrip stock is transferable only on the books of the company, "in person or by attorney," on the surrender of the scrip certificate. The scrip certificate spoken of in the bond as attached to the bond, must be regarded as present to the view and knowledge of any party taking the bond.

Construing the bond and the certificate and the articles of association together, it is apparent, that the company intended to issue its bonds, and secure them by mortgage, and also to allow such bonds to be convertible into full paid preferred stock, at the rate of one share of stock for each $100 of the principal of the bonds. Why not, then, have adopted the simple plan, of declaring that the bond should be convertible into such stock, at the time designated, on the surrender of the bond? Manifestly, because it was desired that the holder of the bond, in addition to being such, and thus being a secured creditor, and in addition to being allowed to have the option of converting his bond into full paid preferred stock, should also, before exercising such option, be allowed certain rights of a stockholder. But, the bond being made payable to bearer, with coupons also payable to bearer, and thus transferable and negotiable by delivery, it would be impossible for the company to know what persons were to exercise these rights of a stockholder, unless it kept a record of such persons. It undoubtedly found that it would be impracticable to adopt the suggestion made in the sixth article of the articles of association, that the bondholders might be authorized to vote in all stockholders' meetings, each $100 of the principal of outstanding bonds to have one vote, and to have the same pro rata voice in the management of the company as if they were stockholders to the amount of their bonds. It found that all who were to exercise any of the rights of stockholders must be stockholders. It, therefore, devised the scheme of scrip preferred stock and the person in whose name such stock should stand on its books was to be entitled to all the rights and privileges of other stockholders, except that he should not be entitled to any dividend, or other profit or increase, from the income or assets of the company. One of those rights and privileges, and, probably, a valuable one, was, that holders of scrip preferred stock, equally with the holders of full paid preferred stock, were entitled to vote in the election of directors of the company; and this, too, to the exclusion of the holders of the common stock, until a dividend should have been earned, declared and paid on the common stock. For these purposes, the company adopted the plan of the scrip preferred stock, transferable only on its books.

The registered owner of the scrip preferred stock could have these rights of a stockholder. If, in addition, he should continue to hold the bond designated in his certificate, he could, by surrendering such bond, convert it, and, at the same time, convert his scrip preferred stock, into full paid preferred stock. But, the company did not require that the bonds should be registered, or that they should be transferable solely on the books of the company, or that the debt evidenced by the bond and the coupons should be transferable otherwise than by the delivery of the same. There is nothing to that effect in the articles of association, or in the bond, or in the certificate of scrip preferred stock. The third article says, that the certificate is to accompany the bond, implying, that the bond, as an obligation for the payment of money, is a complete instrument without the certificate; and that the holder of the bond shall have the right to make full paid stock out of the scrip stock attached to, or accompanying, the bond, on surrendering the bond and the scrip certificate, implying, that to hold the bond as an obligation for the payment of money is one thing, and to obtain full paid stock, by surrendering the bond and the scrip certificate, is another thing. Most unquestionably, the holder of the bond could, at all times, collect his coupons without producing his certificate of scrip stock. So, at maturity, he could demand payment of the principal, without producing such certificate. The certificate is required to be produced only when it is to be surrendered on a transfer of stock, or when it is to be surrendered on a conversion. There is nothing which requires the bonds to be transferred on the books of the company. It is true, that the two transfers to the plaintiff transferred to him the three bonds in question, as well as the thirty shares of scrip preferred stock. But, bond No. 1,947, issued to Sage, was not transferred by Sage to James & Co. on the books of the company, although James & Co. transferred it to the plaintiff on such books. Whatever it may have been intended should have been inserted in the blanks under the headings in respect to transfers on the back of the bond, nothing was inserted therein in any of the bonds in question, nor does it appear that anything was ever inserted therein in any bond that was issued, or that any bond was ever required to be produced to the company when scrip preferred stock was transferred, or that any regulation was ever prescribed respecting the transferring of bonds otherwise than by delivery.

It is, undoubtedly, true, that the register-

ed owner of the scrip stock cannot exercise an option of converting his scrip stock into full paid stock, without producing and surrendering his bond, although he might vote for directors without producing his bond. But, there is nothing to prevent his parting with his position as a mere mortgage creditor, by passing the title to the debt by delivery, by manual tradition of the bond, without transferring the scrip stock. The new holder of the debt will not acquire the right to vote as a stockholder, or any other right of a stockholder, or the right to convert the scrip stock into full paid stock. But, he will be a creditor, entitled to payment of the coupons and of the principal, and to the security of the mortgage. In the bond, the acknowledgment of indebtedness to the persons named, "or bearer," in the sum named, with the promise to pay that sum, and the interest named, on the presentation and surrender of the coupons annexed, is a distinct and separate obligation from anything else in the bond. The agreement in regard to making full paid stock out of the scrip stock attached to, or accompanying, or issued with, the bond, is an additional and supplementary agreement. The articles of association, while they speak of paying interest on the bonds, do not require that the principal of the bonds shall be made payable to bearer, and make no reference to coupons or interest warrants. The bonds might, therefore, have been made registered bonds, and the interest might have been made payable otherwise than by coupons, and otherwise than to the bearers of the coupons. The adoption of the plan of making the principal of the bonds payable to bearer, and of paying the interest by means of coupons payable to bearer, was a deliberate act of choice on the part of the company. It might have made the principal and interest payable only to the person in whose name the scrip preferred stock stood, instead of making them payable to bearer.

From these considerations, it follows, that, if the scrip certificates and the articles of association had been before the officers of the banks who took these bonds, when they took them, no information would thereby have been conveyed to them, that the bonds were not transferable by delivery. There was nothing to prevent the plaintiff himself from parting with the bonds, and thus parting with the right to convert the scrip stock into full paid stock, because he would be unable thereafter to surrender the bonds, while still retaining all other rights incident to the ownership of the scrip stock. It appears, that such right of conversion had, in some cases, been exercised, but, manifestly, the desire to exercise it would be

dependent upon the fact whether the full paid preferred stock was worth more in the market than the bonds with the convertible privilege. It might very well be that the plaintiff himself, or any other person who had been the holder of the bonds offered to the banks, had elected to part with the bonds for what they were worth, unaccompanied by the scrip stock. There was nothing in the bonds, or the scrip certificates, or the articles of association, regarded as before the officers of the banks, to indicate to them the contrary of this, or to make it possible to impute to them that mala fides which it is necessary should exist in the case of coupon bonds, payable to bearer, like these, taken before maturity, for a valuable consideration, in the usual course of business, without notice of any defect of title, in order to impeach the title to them in the hands of the person so taking them. The plaintiff has suffered the bonds to pass into the hands of bona fide holders of them, and fails to impeach their title. In his bill, he alleges bad faith; but none is shown. The principles applicable to the facts of this case are too well settled by authoritative decisions, state and federal, to make it necessary to refer to such decisions, or to the considerations of public policy on which they are founded.

The relief prayed for as to the banks cannot be granted, and the bill must be dismissed, as to them, with costs. As to the railway company, in so far as the bill asks for a decree that the company issue to the plaintiff new certificates of scrip preferred stock, in place of those stolen from him, and admit him to all the rights and privileges which such certificates contract for, the plaintiff is entitled to such relief. He can make such certificates fully available for the purposes of conversion, by purchasing the bonds designated in them.

[NOTE. An appeal was then taken by the complainant to the supreme court, where the judgment of the circuit court was affirmed in an opinion by Mr. Justice Field, who said that the agreement respecting the scrip preferred stock did not affect the negotiability of the bonds, as it was independent of the pecuniary obligation of the company. The absence of the certificates, at the time the bonds were received by the defendants, was not of itself a circumstance sufficient to put the defendants upon inquiry as to the holder's title. The holder might abandon the privilege conferred by them, and rely solely upon the company's obligation to pay the amount stipulated. The defendants, being holders for value of negotiable instruments, before maturity, and without notice, were entitled to retain them. 21 Wall. (88 U. S.) 354.]